UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANNE KENNEY, | |
| Plaintiff, | Hon. Dennis M. Cavanaugh |
| v. | **OPINION** |
| | Civil Action No.: 03-2952 |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

DENNIS M. CAVANAUGH, U.S.D.J.

This matter comes before the Court upon the appeal of Plaintiff Anne Kenney ("Plaintiff") from the Commissioner of the Social Security Administration's ("Commissioner") final decision denying her request for Supplemental Security Income benefits ("SSI") prior to April 1, 2000. This Court has jurisdiction to review this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This matter is decided without oral argument pursuant to Rule 78. As detailed below, it is the finding of this Court that the Commissioner's decision that Plaintiff was not disabled in 1996 is based on a complete analysis, supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

### I. Background

**A. Procedural History**

Plaintiff, alleging disability from severe medical impairments, filed an application for SSI

on February 23, 1996. Her claims were denied initially and on reconsideration. Plaintiff filed a timely request for a hearing before an Administrative Law Judge. The hearing took place on February 17, 1998, before Administrative Law Judge Richard L. De Steno ("ALJ"). The ALJ denied Plaintiff's application on July 13, 1998. On September 10, 1998, Plaintiff filed a timely request for review with the Appeals Council. On April 25, 2000, Plaintiff filed another application for SSI. At the State agency level, Plaintiff received a favorable determination regarding this second application.

However, on October 19, 2001, the Appeals Council vacated both decisions, consolidated the two claims and remanded those claims to the ALJ for joint adjudication. A post-remand hearing was held on March 5, 2002. The ALJ issued a decision March 13, 2002, finding Plaintiff disabled as of April 1, 2000, but not prior thereto. On May 16, 2002, Plaintiff filed a timely request for review with the Appeals Council. The Appeals Council denied Plaintiff's request for review on April 18, 2003. Upon that denial, the ALJ's ruling became the Commissioner's final decision. On June 20, 2003, Plaintiff filed the instant action.

### B. Factual History

Plaintiff, born May 14, 1946, describes her disabling condition as "severe orthopedic, pulmonary, and psychiatric conditions." (Compl. ¶ 5.) At the February 17, 1998 hearing, she testified that her difficulty bending and her asthma limited her ability to work. (*See* R. at 19.) However, she explained that she was capable of sitting or standing for thirty minute increments; walking approximately 1.5 blocks; and, with the use of two hands, carrying a gallon of water. *Id.* On a daily basis, Plaintiff noted her ability to care for herself and perform common chores, such as shopping and cooking. *Id.* At the March 2, 2002 post-remand hearing, Plaintiff alleged lower back pain, asthma, as well as depression and anxiety. (R. at 39.) She testified that the pain affects her daily life. (R. at 40.) She can stand for about 10 minutes and walk approximately one block before

she requires a cane for stability. *Id.* She has been using an unprescribed cane since 2000. *Id.* She has difficulty with her right hand, which has gradually worsened. (R. at 42.) As a result, she can only lift/carry approximately five pounds. (R. at 43.) She treats her pain with Extra Strength Tylenol, which she takes three times a day. (R. at 47.) Her pulmonary condition is controlled by the use of inhalers. (R. at 46.) In addition to her physical ailments, Plaintiff testified that she is depressed and anxious due to the stress of dealing with a schizophrenic son and the loss of other close family members. (R. at 43-45.) Despite her mental health complaints, Plaintiff has not sought any psychiatric treatment. (R. at 45.)

In regards to the Plaintiff's pulmonary condition, Dr. Ciechanowski's treatment notes at Christ Hospital from May 2, 1996 through June 13, 1996, characterize Plaintiff's asthma as stable. (R. at 176-78, 180, 182, 184.) Subsequent pulmonary studies, on July 26, 1996, suggest only mild restrictive airway disease unchanged by broncodilation. (R. at 186.) Although chest x-rays revealed lungs with good aeration, emergency room treatment notes from Christ Hospital indicate that Plaintiff experienced an acute exacerbation of asthma on March 8, 1997. (R. at 204, 208.) The emergency room at Palisades General Hospital later diagnosed Plaintiff with bronchial asthma. (R. at 209-10.) Upon complaint of shortness of breath and wheezing, she was prescribed Proventil on March 28, 1997. *Id.* After an acute exacerbation on January 8, 1998, Dr. Ciechanowski, Plaintiff's treating physician, noted that Plaintiff had chronic daily symptoms of moderately severe asthma, which limited her activities. (R. at 26,188.) As of April 25, 2000, Dr. Robinson, at the Center for Family Health, noted that Plaintiff's asthma was well controlled, despite some mild wheezing for which she advised an Inhaler. (R. at 370.) A chest X-ray on July 19, 2000 revealed well aerated lungs. (R. at 325.) On August 4, 2000, an attending physician at the Center for Family Health noted that Plaintiff's asthma was stable. (R. at 347.) Despite the occasional acute exacerbations,

physicians noted that Plaintiff's extremities showed no signs of edema, cyanosis, or clubbing. (R. at 194, 371.)

On April 25, 2000, Dr. Robinson diagnosed depression and anxiety. (R. at 370.) Dr. Robinson later reviewed this diagnosis and referred Plaintiff to the Community Mental Health Center. (R. at 367.) At the exam on July 20, 2000, Dr. Sivadas noted that Plaintiff was alert, oriented, talkative, and cooperative, but assessed depression and anxiety by history. (R. at 322.) On August 4, 2000 an attending physician at the Center for Family Health noted that Plaintiff's depression was stable. (R. at 347.) However, on August 30, 2000, Plaintiff was reported to have an adjustment disorder with anxious depressed mood. (R. at 337.) Dr. Herman Huber, a state agency psychological consultant, noted that Plaintiff had symptoms of anxiety on September 6, 2000. (R. at 249-50.) Nevertheless, he noted that she had no hostipitalizations or treatments of that condition. (R. at 250.) He, too, assessed an adjustment disorder with anxious and depressed mood, but concluded that Plaintiff's disorder was not a severe impairment. (R. at 249, 252.)

Complaints of orthopedic problems date back to 1996. (R. at 199.) On December 2, 1996, an X-ray of the lumbosacral spine revealed reduction of the disc space at L4, L5 and L5/S-1 as well as spondylolisthesis at L5-S1. *Id.* The physician also noted a vacuum phenomenon and renal calculi. *Id.* On June 18, 1997, Plaintiff had some swelling of the left ankle, for which an attending physician at Palisades General Hospital recommended exercise, Tylenol, and weight loss. (R. at 194.) On October 11, 1999, Plaintiff complained of back and knee pain. (R. at 374.) Dr. Robinson assessed mild radiculopathy of the lumbosacral spine and advised Plaintiff to attend physical therapy. *Id.* By February 22, 2000, Plaintiff had full range of motion in the knees. (R. at 371.) Again, Plaintiff complained of lower back pain, on May 8, 2000, and was prescribed Toradol. (R. at 365.) Dr. Robinson advised Plaintiff to attend physical therapy and take Motrin. *Id.* Another X-

ray of the lumbosacral spine, taken on July 11, 2000, revealed degenerative changes at the L5-S1 level with narrowing of the vacuum disc as well as spondylolisthesis with mild changes in the lumbar spine. (R. at 354.) X-rays of the cervical spine revealed marked degenerative changes at multiple levels. (R. at 355.)

An X-ray, taken on July 19, 2000, revealed loss of normal lordosis and spondylosis in the cervical spine as well as degenerative joint disease and sponylolisthesis in the lumbosacral spine. (R. at 324-25.) Nevertheless, on July 20, 2000, Dr. Sivadas observed that Plaintiff's cervical spine had a normal range of motion. (R. at 321.) The physician observed no focal tenderness in the lumbar spine, but noted nodes on the joints of the fingers. *Id.* Dr. Sivadas noted Plaintiff's difficulty mounting and dismounting the examination table as well as her moderate obesity. *Id.* On August 4, 2000, an attending physician recommended physical therapy as treatment for Plaintiff's lower back pain. (R. at 347.)

Plaintiff hired her own expert to testify at the post-remand hearing. (Pl. Br. at 15.) Dr. Mylod, a board certified orthopedic surgeon without an examining or treating relationship to the Plaintiff, assessed the Plaintiff's condition. (R. at 51-54.) He testified that the Plaintiff's condition did not meet or equal a listed impairment. (R. at 54.) He noted her cervical and lumbar spine conditions as well as the osteoarthritis in the hands and knees. (R. at 53.) The 1996 X-ray revealed Grade I spondylolisthesis and the 2000 X-rays show a progression to Grade II. (R. at 53-54.) This progression is evidence of instability. (R. at 60.) Grade I would limit her capacity to lift to less than 10 pounds. (R. at 61.) Dr. Mylod explained that Plaintiff, given her medical problems, would have difficulty walking/standing for more than two hours in an eight-hour workday. (R. at 55.) Plaintiff could sit for approximately six hours during an eight-hour workday, but not for a full five working days. (R. at 57.) The joint problems in Plaintiff's hands prohibited her from handling more than five

pounds on a repetitive basis. (R. at 53-54, 56.) Dr. Mylod testified that these limitations began in 1996. (R. at 55.) Nevertheless, throughout his testimony, Dr. Mylod notes the lack of sufficient evidence, such as X-rays, to support his conclusion. (R. at 53, 58, 60, 62.)

The Commissioner called Dr. Fechner, an internist without an examining or treating relationship to the Plaintiff, who also testified at the post-remand hearing. (R. at 62.) Dr. Fechner concurred with Dr. Mylod that none of Plaintiff's impairments were of listing-level severity. (R. at 64.) Plaintiff's asthma, which goes back to 1996, was not severe enough for hospitalization and her medications are typical of persons with mild-moderate asthma. (R. at 62-63.) Dr. Fechner also noted that the evidence in the record is not clear regarding the Plaintiff's daily asthma attacks. (R. at 66, 70-74.) Her psychiatric problems date back to 2000, but her condition was difficult to assess because there was only one examination on record. (R. at 66.) Dr. Fechner concurred with Dr. Mylod that X-rays of the spine revealed degenerative changes and an examination revealed nodes on the fingers of both hands. *Id.* Dr. Fechner also agreed with Dr. Mylod that there is a lack of sufficient evidence, such as X-rays. *Id.* He also agreed that such a degenerative condition progresses slowly. *Id.* However, Dr. Fechner's opinion differs from Dr. Mylod in that he refused to pinpoint 1996 as the exact date at which Plaintiff became disabled. *Id.* In his exact words,

> [A]gain as Dr. Mylod said, these orthopedic conditions creep up slowly, they don't happen from day to day so that certainly the [Plaintiff's residual functional capacity] of 2000 could be taken back with or without any notes from before a certain amount of time. How much[,] that is difficult to say....Bringing it back to 1996 is a long period though. It's four years and so I would have problems doing that...

*Id.*

On June 27, 1996, Dr. Calakos, a state agency medical consultant, reviewed Plaintiff's medical records and assessed her functional capacity. (R. at 152-59.) Given the Plaintiff's history

of pulmonary issues, the consultant advised against exposure to pulmonary irritants, such as extreme hot and cold, wetness, humidity, and fumes. (R. at 153, 159.) The assessment noted that Plaintiff could frequently lift/carry up to 25 pounds (occasionally as much as 50 pounds); Plaintiff's ability to push/pull was limited proportionally to her ability to lift/carry. (R. at 153.) In a normal workday, Plaintiff was capable of standing/walking or sitting for approximately 6 hours. *Id.* Dr. Levine, a state agency medical consultant, also reviewed Plaintiff's medical records and assessed her functional capacity on August 17, 2000. (R. at 241-48.) This second assessment noted that Plaintiff could frequently lift/carry up to 10 pounds (occasionally as much as 20 pounds); Plaintiff's ability to push/pull was limited proportionally to her ability to lift/carry. (R. at 242.) The consultant noted the various X-rays and Dr. Sivadas' examination. *Id.* In a normal workday, Plaintiff was capable of standing/walking or sitting for approximately 6 hours; however, Plaintiff's depression, anxiety, asthma and arthritis would adversely impact her ability to work. (R. at 242, 246.) Thus, the agency determined that Plaintiff's disability began on April 1, 2000. (R. at 240.)

Plaintiff has a high school education as well as one year of college education; she has no past relevant work experience. (R. at 269; Compl. ¶ 4.) At the post-remand hearing, Dr. R. Meola, a vocational expert, testified that a hypothetical person of Plaintiff's age, education, and work experience could have performed light work in an area free from pulmonary pollutants prior to March 2000. (R. at 77.) Furthermore, the expert noted approximately 2,500 jobs in the region and 10,000 jobs in the New York metropolitan area which met that criteria. (R. at 79.)

## II. Standard of Review

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied sub nom. Williams v. Shalala*, 507 U.S. 924 (1993). "Substantial

evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Some types of evidence will not be "substantial." For example:

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. *Stewart v. Sec'y of Health, Educ., and Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). "Where the ALJ's findings of fact are supported by substantial evidence, the [reviewing court] is bound by these findings, even if [it] would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 35 (3d Cir. 2001). Thus, substantial evidence may be slightly less than a preponderance. *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

"The reviewing court, however, does have a duty to review the evidence in its totality." *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)). In order to review the evidence, "a court must 'take into account whatever in the record fairly detracts from its weight.'" *Id*. (quoting *Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988)). The Commissioner has a corresponding duty to facilitate the Court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."

*Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful Court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).  "[The reviewing court] need[s] from the ALJ not only an expression of the evidence []he considered which supports the result, but also some indication of the evidence which was rejected."  *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).  Without such an indication by the ALJ, the reviewing court cannot conduct an accurate review of the matter; the court cannot determine whether the evidence was discredited or simply ignored.  *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citing *Cotter*, 642 F. 2d at 705); *Walton v. Halter*, 243 F.3d 703, 710 (3d Cir. 2001).  "The district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams*, 970 F.2d at 1182 (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)).

### III.  Discussion

Plaintiff makes four arguments in support of her position that the Commissioner's decision is not supported by substantial evidence.  First, Plaintiff argues that her treating physician was improperly dismissed "for no reason other than to deny benefits." (Pl. Br. at 14.)  Second, Plaintiff also contends that the ALJ improperly dismissed her expert's opinion as biased.  (Pl. Br. 8 -12.)  Third, Plaintiff contends that the ALJ erred by failing to appoint a medical expert specializing in the field of orthopedics.  (Pl. Br. at 10-11.)  Finally, Plaintiff argues that her case is analogous to *Leach*

*v. Barnhart*, 94 F.App'x 910 (3d Cir. 2004) and implores this court to make a similar ruling. *Id.* Each argument will be discussed individually.

### A. Dismissal of Plaintiff's Treating Physician

Plaintiff contends that the ALJ improperly dismissed the opinion of her treating physician. (Pl. Br. at 12-14.) Plaintiff notes, "where a report of a treating physician conflicts with that of a consulting physician, the ALJ must explain on the record the reasons for rejecting the opinion of the treating physician." *Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989). Further, Plaintiff argues that "absent persuasive contradictory evidence, the validity of the claimant's symptoms can be conclusively established by the opinion of the treating physician." *Smith v. Sullivan*, 720 F. Supp. 62, 64 (E.D.Pa. 1989). Although Plaintiff correctly cites the applicable law, the Court finds that the ALJ properly explained his reasons for rejecting the opinion of Plaintiff's treating physician.

The ALJ's decision adequately justifies his reasons for rejecting Dr. Ciechanowski's opinion that Plaintiff experiences daily chronic symptoms of moderately severe asthma. As the ALJ explains and the record shows, Dr. Ciechanowski only examined Plaintiff on an infrequent basis. (R. at 21.) In addition, the ALJ found that Dr. Ciechanowski's opinion was "unsupported by objective medical evidence." *Id.* Reviewing the evidence in its totality, the Court finds that those conclusions are supported by substantial evidence. Dr. Ciechanowski frequently noted that Plaintiff's asthma is stable. (R. at 176-78, 180, 182, 184.) Pulmonary function studies show only mild restrictive airway disease. (R. at 186.) Chest x-rays revealed that Plaintiff's lungs were well aerated. (R. at 325.) Dr. Robinson, as well as an attending physician at the Center for Family Health, repeatedly observed that the Plaintiff's asthma was stable. (R. at 347, 370.) Furthermore, the ALJ notes that Dr. Ciechanowski issued his opinion immediately after an acute exacerbation, which may have compromised his assessment. (R. at 26.) Thus, given the presence of contradictory evidence and

the ALJ's explanation, this Court finds that the opinion of the Plaintiff's treating physician was properly afforded little weight.

### B. Dismissal of Plaintiff's Expert's Opinion

Plaintiff also argues that the ALJ improperly dismissed her expert's opinion. The ALJ notes in his decision that he afforded Dr. Mylod's opinion little weight, because Dr. Mylod was a non-examining source. (R. at 25); *see* 20 C.F.R. § 416.927(d)(1) (explaining that more weight is generally give to the opinion of an examining source). Furthermore, the ALJ notes a potential bias, because Dr. Mylod has a major pecuniary interest in an outcome favorable to the Plaintiff. (R. at 24.) Plaintiff argues that Dr. Mylod is not biased, but rather a "Board Certified Orthopedic Surgeon who remains on the roster of the Social Security Medical Experts specializing in orthopedics." (Pl. Br. at 8.) Plaintiff also criticizes the ALJ for providing "no evidentiary contradiction to Dr. Mylod's opinion." (Pl. Br. at 9-10.) This Court disagrees with Plaintiff's arguments.

"Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121. Without such a indication, the reviewing court cannot determine whether the ALJ's findings were supported by substantial evidence. *Id*. If, however, the record reveals a sufficient basis for the ALJ's determination to discredit a witness, the reviewing court will defer to the ALJ's determination. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). In this matter, the ALJ weighed Dr. Mylod's opinion, as a non-examining source, and his supporting explanations against the other pertinent evidence. (R. at 25.) In view of the totality of evidence, the ALJ found that Dr. Mylod's "opinion was not satisfactorily supported by the doctor and ... not supported by the objective record evidence." (R. at 25.) Dr. Mylod repeatedly explained that his opinion was unsupported by objective medical evidence establishing orthopedic impairments prior to the year 2000. (R. at 25, 53, 58, 60, 62.) In

addition, Dr. Robinson assessed a mild orthopedic condition as late as October 1999. (R. at 374.) The ALJ also noted, but made no finding, that Dr. Mylod has "a major pecuniary interest in testifying consistent with disability." (R. at 24.) He based this determination partially on his experience with the expert. *Id.* Dr. Mylod's testimony, discussed at length in the ALJ's decision, serves as additional support for the ALJ's determination. *Id.* These statements provide some indication of the evidence rejected and the reasons for doing so; thus, this Court finds that the ALJ's conclusion to afford Dr. Mylod's opinion little weight is supported by substantial evidence.

### C. Failure to Appoint an Expert Specializing in the Field of Disability

Plaintiff asserts that the ALJ's failure to appoint a medical expert specializing in the field of orthopedics was part of the ALJ's larger scheme to deny Plaintiff disability benefits. (Pl. Br. at 11-12.) Plaintiff argues that the ALJ *must* appoint a medical expert *specializing in the field of disability* in an instance where disability is later established due to a slowly progressing illness. *Id.* (emphasis added). Plaintiff supports this argument with citations to "HALLEX I-2-434(A)," which is conspicuously absent from the manual, as well as S.S.R 83-20 and *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 548 (3d Cir. 2003). *Id.*; 1 HEARINGS, APPEALS, AND LITIGATION LAW MANUAL, *available at* http://www.ssa.gov/OP_Home/hallex/I-02/I-2-4.html (*Hereinafter,* HALLEX). After a careful reading of the S.S.R. 83-20 and the Third Circuit's opinion in *Newell*, this Court finds no such rule. Instead, the Third Circuit, citing S.S.R. 83-20, stated, "[The ALJ] should call on the services of a *medical advisor* when onset [of the disability] must be inferred." *Newell*, 347 F.3d at 548 (emphasis added). In *Newell*, the Third Circuit makes no mention of specialization. *Id.* In the instant matter, the ALJ appointed Dr. Fecnher as a medical advisor, in accordance with S.S.R 83-20 and *Newell*. Thus, Plaintiff's argument regarding the expert's expertise lacks adequate support.

The Commissioner notes, however, that "HALLEX I-2-5-36 provides that the ALJ ... must

select the medical expert whose expertise is *most appropriate* to the claimant's diagnosed impairment(s)." (Def. Br. at 22 (citing HALLEX I-2-5-36, *available at* http://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-36.html)(emphasis added)). Even assuming, *arguendo*, that Plaintiff meant to rely on HALLEX I-2-5-36, her position still fails. Plaintiff suffers from varied medical problems. (Compl. ¶ 5, Def. Br. at 22.) Given her history, the Commissioner, in accordance with HALLEX I-2-5-36(D), randomly selected Dr. Fechner from the roster of approved medical experts. (Def. Br. at 22 (citing R. at 24)). Thus, substantial evidence shows that the ALJ followed proper procedure in appointing Dr. Fechner as an expert witness and did not scheme to manipulate the evidence against Plaintiff.

### D. Leach v. Barnhart

Plaintiff analogizes this case to *Leach* and urges the Court to make a similar ruling. In that case, the ALJ's decision was reversed by the Third Circuit, because the record did not support his credibility determinations. *Leach*, 94 F.App'x at 912. Plaintiff uses this case to support a theory that the ALJ has "proven allergic" to remand orders. (Pl. Br. at 11.) Furthermore, Plaintiff alleges that the similarities between this case and *Leach* show a "pattern of evidence manipulation." (Pl. Br. at 9.) However, Plaintiff's only support for this argument is that *Leach* involved both the same ALJ and the same Dr. Mylod. *Leach*, 94 F.App'x at 911-12. Although this coincidence raises a red flag, it does not necessarily result in the conclusion that the ALJ's decision is unsupported by substantial evidence. "The reviewing court ... [has] a duty to review the evidence in its totality." *Daring*, 727 F.2d at 70. Thus, the Court must review the evidence before issuing a similar ruling.

Plaintiff asserts that the ALJ ignored Dr. Mylod's opinion and manipulated the evidence in favor of his own orthopedic opinion. (Pl. Br. at 9.) Plaintiff argues that "ALJ Desteno [sic] did what ALJ Desteno [sic] always does....[He] dismisses Dr. Mylod as a bias witness ... [and] he takes Dr.

Fetchner's [sic] RFC as [B]iblical truth" (Pl. Br. at 8-9.)  The Court rejects Plaintiff's theory.  Dr. Mylod admitted that his disability determination was unsupported by objective medical evidence. (R. at 53, 58, 60, 62.)  The exception of that unsupported disability determination dating back to 1996, Dr. Fechner's testimony was directly in line with Dr. Mylod's testimony.  (R. at 66.)  In fact, Dr. Fechner's more cautious determination had more evidential support than Dr. Mylod's Plaintiff-friendly RFC.  Furthermore, in *Leach*, the ALJ made contradictory statements regarding Dr. Mylod's credibility.  *Leach*, 94 F.App'x at 912.  No such contradictions are present in this case.  In *Leach*, the ALJ also made conclusory statements, which lacked the support of substantial evidence.  *Id.*  As previously discussed, the Court finds that the ALJ has supported his credibility determination in this case.  Specifically, the ALJ listened to Dr. Mylod's testimony and used it as evidence to support his decision.

### IV. Conclusion

For the reasons expressed above, the Court affirms the Commissioner's disability determination. Accordingly, this case is CLOSED.

Date:  February 21, 2006
Orig:  Clerk's Office
cc:    All parties
       File

 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.